## JAMES DUNDAS et al. *v.* JAMES ERWIN et al.

There were two parties who claimed the rent from a tenant. He selected the party to whom he should make payment, taking a bond of indemnity, in case it should be decided in a suit then pending that the other party was entitled to the rent. It was subsequently decided that he had paid the wrong party. In settling with the party entitled to the rent, he transferred, in part payment, the bond of indemnity he had taken from the other party. Upon this bond suit was brought. *Held :* That the bond was legal, and that the plaintiffs were entitled to recover on it.

APPEAL from the Third District Court of New Orleans, *Kennedy*, J. *T. A. Clarke*, for plaintiffs. *Mott* and *Ogden* and *Duncan*, for defendants. The judgment of the court was pronounced by

PRESTON, J. Properly to understand this case, it is necessary to state its origin. *Henry Hitchcock*, late of Mobile, was indebted to the United States Bank of Pennsylvania in a sum exceeding $620,000, to secure which he

gave a bond and mortgage to the trustees of the bank upon a valuable property situated in the city of Mobile, called Hitchcock's Cotton Press, and upon other lands. The debt was not paid, and the bond and mortgage were forfeited. The bank filed a bill to foreclose the mortgage, to which *Hitchcock* plead that the bond and mortgage were not valid because given for a corrupt and usurious loan of money. He shortly afterwards departed this life, having by will bequeathed all his estate to his widow, *Anne Hitchcock*, with power to pay his debts by a public or private sale of his property.

A bill was filed against her by the trustees of the bank to foreclose the mortgage; but it appears it was conducted amicably, to enable them to obtain the peaceable and quiet possession of the mortgaged premises; for in 1840, in consideration of the debt and interest, and a further sum of $150,000, paid to her agent, *James Erwin*, she conveyed to the trustees of the bank all her legal and equitable title to the mortgaged property, and put them into the peaceable possession of the same. Notwithstanding all this, *Mrs. Hitchcock* was induced subsequently to renounce all her rights under the will of her husband, and to claim such rights as she was entitled to by law, including dower, and to defend the bill for a foreclosure of the mortgage, on the plea of usury filed by her husband. *Isaac H. Erwin*, a a brother, was appointed administrator of *Hitchcock's* estate, with his will annexed. The trustees of the bank alleged under oath that he was appointed at their instance, with a view to carry the amicable arrangement into effect. He denied it under oath, and at all events made the most strenuous efforts to defeat the arrangement. He plead, that the bond and mortgage were void; that *Mrs. Hitchcock* had no right to convey the mortgaged property; and that her transfer of it was invalid. He claimed the whole property for the creditors and heirs; and so formidable were his pretensions, that the trustees of the bank offered him a sum of upwards of $60,000 to quiet their title, which he declined to receive.

*James Erwin*, another brother, who had been her agent, and apparently the principal actor in arranging the conveyance to the trustees of the bank of the quiet and peaceable possession of the mortgaged premises, and into whose hands the sum of $150,000 had been paid as the consideration for quieting the title, immediately after receiving the money became the most active operator in disturbing the title and possession of the bank. By virtue of an old judgment against *Hitchcock*, a writ of execution was issued, a seizure was made of the Hitchcock Cotton Press, with the extensive property on which it was situated, estimated in the mortgage and conveyance to the trustees of the bank at $163,000, and was sold by the sheriff of Mobile, and *James Erwin* became the purchaser for $4500. This brings us to the circumstances which gave rise to the present suit, and which must be recited with dates to show their bearing upon it.

On the 10th of October, 1838, *Henry Hitchcock* had leased the above mentioned property, known as his cotton press, to *Henry Hurtil* and *Charles J. Mansoni* for the term of five years, for the sum of one hundred thousand dollars, payable on the terms and conditions particularly set forth in the lease. In 1839, the trustees of the bank filed a bill in equity, as we have stated, to foreclose their mortgage. At the May term of that year of the Chancery Court at Mobile, *Hitchcock* filed his answer on oath that the bond and mortgage were given upon a corrupt and usurious consideration, and prayed that they should be decreed to be invalid. At the same term of the court, the complainants applied for the appointment of a receiver, which the chancellor refused to order. *Hitchcock*

died·before the fall term of the court; and at the May term, in 1840, the complainants dismissed their bill without prejudice to them.

On the 8th of February, 1840, in pursuance of the powers given by her husband's will, as already mentioned, *Mrs. Hitchcock* conveyed to the trustees all the property mortgaged by him to the bank; and *Hurtil* and *Mansoni*, the tenants of the cotton press, were notified of the·conveyance, and acknowledged the trustees of the bank as their landlords. As soon as the additional sum of $150,000 was received from the bank, the contest for the property was renewed. On the 30th of October, 1840, *Isaac H. Erwin* was appointed administrator of *Henry Hitchcock's* estate, with the will annexed; and warned the lessees that he was the only legal representative of the estate, and demanded the payment of the rents to him alone. On the 1st of November, 1840, under the execution and seizure we have mentioned, the sheriff of the county sold, after public advertisements, to *James Erwin* the cotton press and premises which were leased to *Hurtil* and *Mansoni* for $4500, which he acknowledged to have received. The sheriff also made a deed of the property, which was duly recorded. On this sheriff's deed *James Erwin* demanded the rent from the tenants. *Isaac H. Erwin*, the duly appointed and qualified administrator of *Hitchcock*, their original lessor, claimed the past and directed the future rents to be paid to *James Erwin*. They refused to pay him; and on the 3d of March, 1841, he brought a suit in the Circuit Court of the United States against them to eject them from the premises.

During the whole of this time, the trustees of the bank took no steps against *Mrs. Hitchcock* or the *Erwins* having the effect to protect the tenants against their claims. It is true, a bill to restrain their proceedings was filed on the 28th of November, 1840, but no receiver was appointed until the 5th of June, 1841, and he was not ordered to collect rents from the tenants until in November of that year. In the meantime, the tenants *Hurtil* and *Mansoni*, had paid the rents, the amount of which is the subject of this suit, to *James Erwin*, but not until they had exacted from him the following bond of indemnity :

"State of Alabama, City of Mobile. Know all men, by these presents, that we, the undersigned, *James Erwin*, first, and *Joseph Woods*, *Robert Woods*, and *Jane Bell*, composing the firm of *Yeatman, Woods & Co.*, are held and firmly bound in the penal sum of one hundred thousand dollars unto *Furman Hurtil* and *C. J. Mansoni*, of this city, good and lawful money, to be paid unto them, their heirs or assigns, subject to the following conditions, to wit: Whereas the said *F. Hurtil* and *C. J. Mansoni* did in the lifetime of *Henry Hitchcock*, late of this city, lease of him a certain cotton press known as Hitchcock's Press, the same now occupied by them, for the term of five years, on terms set forth in a contract now in their possession, to which reference is made ; and whereas the said *Hitchcock* did mortgage the said cotton press to the Bank of the United States, who, by said mortgages and other conveyances or writings, claim to be the owners of said press, now in possession of said *Hurtil* and *Mansoni*, held by them as tenants of *James Erwin*, to whom they they have regularly attorned, he, said *Erwin*, having purchased said press at sheriff's sale ; and the said *Hurtil* and *Mansoni* having been called on by *Isaac H. Erwin*, administrator of *Henry Hitchcock*, deceased, regularly qualified as such to pay all rents due to the estate of *H. Hitchcock* on said lease, and he having furthermore authorized the said *Hurtil* and *Mansoni* to pay the rents accruing after said delivery to *James Erwin*, the purchaser of said property, and the said *J. Erwin* having called on *Hurtil* and *Mansoni* and received the said rents. It is, therefore,

expressly agreed to, the parties to this bond, viz : *James Erwin* and *Yeatman,* *Woods & Co.* agree to hold the said *Hurtil* and *Mansoni* harmless against all or any responsibility that may attach to them for having improperly settled with *I. H. Erwin,* or for any monies improperly paid to *James Erwin,* now or here- .after, on account of rents of said cotton press and wharf, or by reason of said delivery of possession ; also against all costs or damages in suits for defending or holding possession of said property, as tenants of *James Erwin,* as the intention of *James Erwin* and *Yeatman, Woods & Co.* is to completely protect and hold *F. Hurtil* and *C. J. Mansoni* harmless on account of all responsibility for pay- ments made or to be made for rents, costs or damages in that way. That being done then this bond to be null and void.

" Witness our hands and seals this 16th of May, 1841,  (Signed,)  [L. s.]  J. ERWIN.  [L. s.]  JOS. WOODS.  [L. s.]  ROBERT WOODS.  [L. s.]  JANE BELL, [L. s.]  A. ERWIN, trustee for *John* and *Jane Bell.*"

Thus secured by this bond, the tenants made settlements with the adminis- trator, which are abandoned in this suit, but also, on the 18th of May, 1841, paid *James Erwin* $14,800 rents then due, the amount of which is the subject of the present suit. Notwithstanding the appointment of a receiver, and his demand of the rents, the tenants, secured by the above bond, refused to pay rents to him, and were ruled to show cause why an attachment for contempt of court should not issue against them. In their answer on oath, the truth of which is not disputed, they set out the foregoing facts. They further state, that they were advised by high legal authority that the conveyance by *Mrs. Hitch- cock* to the trustees of the bank was invalid, as well as the bond and mortgage of *Hitchcock,* and that the sheriff's deed to *James Erwin* was a valid conveyance of the property. Nevertheless, that they applied to the trustees of the bank to indemnify them, being willing to pay them if such an indemnity had been given ; but that the trustees refused to give them security, and demanded the rent without indemnity ; and their, in consequence of that refusal, they made the settlements with the administrator, and payments to *James Erwin* on receiving satisfactory security. In April, 1842, they were ordered by the chan- cellor to pay the rents to a receiver, and that an attachment should issue against them if they failed to do so. They took a writ of error to the Supreme Court of Alabama ; but it was dismissed in March, 1843, as having been improperly sued out.

In the meantime, the trustees of the bank, or rather the present plaintiffs, to whom their rights had been assigned, prosecuted their suit in equity against *Mrs. Hitchcock,* the *Erwins,* and indeed against the tenants of the cotton press who had been made parties, and obtained a decree of the chancellor at Mobile in their favor, declaring that the premises and rents belonged to them. A writ of error was taken to the Supreme Court of Alabama; and the most elaborate and able arguments of distinguished counsel were offered against the validity of the bond and mortgage of *Henry Hitchcock* to the bank, and the conveyance of his widow to its trustees. Their arguments and authorities were not treated lightly ; but equal ability and profound research and argument was employed by the trustees of the bank to combat them. And the Supreme Court of Alabama evidently did not regard the controversy as one which *Hurtil* and *Mansoni·* might have decided for themselves, and concluded that they were tenants of the bank, on pain of being guilty of a species of treason, as has been contended in this court; but were enabled only by profound research and reflection developed

in an opinion extending over eighteen pages of their reports to decide that the bond and mortgage of *Hitchcock*, and the conveyance by his widow to the bank were valid. They so decided in 1845, and affirmed the decree of the chancellor at Mobile.

While this controversy was pending the receiver had sued the tenants *Hurtil* and *Mansoni*, and obtained a verdict and judgment for the balance of rent due upon the lease, including the $14,800 they had paid to *James Erwin*. This is positively proved by a witness; but the counsel of the defendant has endeavored to show, that the court and jury allowed eight per cent interest on the arrearages of rents, and thereby that the witness is in error on this subject. We have no evidence that the jury allowed interest; but there is internal evidence in the verdict that they did not, and that they charged the defendants with the rent paid to *James Erwin*. The whole rent due on the lease was $100,000. There was paid to *Hitchcock* during his life, and allowed for disbursements and losses under the lease $26,057 63 ; leaving unpaid $73,942 37, exceeding by $800 the verdict, and showing clearly that the defendants were charged with the whole time for which they had made payments to the *Erwins*. Independent of those payments, the defendants owed but $50,000 for the rent of the last two years, and one installment on the third year, $7000; in the aggregate, $57,000. And yet judgment was rendered for $73,142, being rather less than the foregoing sum added to what they had paid to both the *Erwins*. It therefore clearly included what the tenants paid to the *Erwins*.

This being established, there appears to be a little inconsistency in the argument of defendants' counsel, in which he first reproaches the tenants almost, as traitors, for not having paid the $14,800 to the trustees of the bank instead of *Erwin ;* and, next, is equally severe upon them for not having defended themselves successfully against its payment to the receiver for the assignees of the bank.

Be this as it may, the judgment was rendered against the tenants for the rent, including the $14,800 paid to *James Erwin ;* and they gave their bond of indemnity in payment of so much, with which the assignees of the bank, who were finally decreed to be their true landlords, were satisfied. And the assignees, the present plaintiffs, have sued on the bond for the recovery of the same sum from *James Erwin*, the obligor, and his securities.

It is alleged, and so the district court has decided, that the bond was given for the illegal and immoral purpose of inducing a tenant to betray his allegiance to his landlord, and cannot be enforced now. Although the feudal terms of *landlord* and *attornment* are still retained, we consider that the contract between lessor and lessee is to be interpreted in this country like any other contract; and that tenants may protect themselves against the adverse claims of different persons to the rent by any fair and reasonable means. There is no treason in a tenant's violating his contract; but there is bad faith, if without reason he combines with a third person to defeat the claim of his lessor for rent. And even in that case we cannot see why he and those who combined with him and induced him to act in bad faith, should not be condemned, as expressly provided by our code and statutes, *in solido* to pay the damages to the injured party. Art. 2304. Acts 1844, p. 14. The damages to be paid would be the rent received by *Erwin*, who seduced the tenants from their allegiance—the very thing which is claimed by the injured party from *Erwin* and his securities in this suit.

But we forbear further remark on this view of the subject, being perfectly satisfied by the evidence, that the tenants acted in good faith, and only exercised

DUNDAS
*v.*
ERWIN.

a prudent precaution to protect themselves, without the intention to injure any one.

When rented property is seized and sold under execution, and transferred by the sheriff by deed and delivery to a new proprietor, the rent should be paid to him. A sheriff's seizure, sale and deed should be what it purports to be. He should take corporeal possession of the property, advertise and sell it publicly, and after the sale deliver actual, and not fictitious, possession to the purchaser. All should be done under the authority of the court which issued the execution. And this, as to the tenants, is the eviction of their landlord.

If the property seized does not belong to the defendant in execution, it is the duty of the true proprietor to enjoin the sheriff and plaintiff in execution; and to protect his tenant as well as himself against all doubt as to the ownership of the property. If he permits the public sale to proceed, and himself and tenant to be dispossessed, he cannot complain if the tenant subsequently doubts as to whom to pay the rent, and, when sued for the possession of the property, refuses to pay his lessor without security. And if the landlord neither enjoins the sale nor gives the security, he cannot complain that the tenant should pay his rent to the apparent legal owner of the property, especially on taking a bond of indemnity, which may eventually inure to the landlord's benefit.

These principles entirely exonerate *Hurtil* and *Mansoni* from bad faith in their contract with *James Erwin*. Moreover, as an administrator, with the will annexed, was appointed to *Hitchcock's* estate; as he demanded all arrears of rent; disavowed the conveyance of *Mrs. Hitchcock* to the trustees of the bank; as she joined him in disavowing its validity; as the parties were litigating the matter before a court of chancery, and no receiver was appointed; and as able counsel advised the tenants that the conveyance was invalid, nothing was more reasonable than that they should settle with the party that gave them ample indemnification, and refuse to pay the other party who declined to do so, and had not yet caused the rents to be sequestered in the hands of a receiver. Under these circumstances the tenants settled and paid the whole rent then due, to the *Erwins*; and, in so doing, we have no reason to believe acted in bad faith, but as prudent and honest men.

And although the chancellor, in ordering the tenants to pay the receiver, very properly speaks of the general rule of law, resting on sound principles of morality, that tenants are held to the strictest fidelity to their landlords, and that they cannot make a contract with an adversary claimant so as to change their relation to their landlord or affect his interest or possession; yet the basis of his decision mainly rests on the ground that the payment to a receiver would secure the rights of both landlord and tenant until it was ascertained who was landlord.

Now, before the receiver was appointed the bond of indemnity was taken, substantially for the same purpose, to secure whoever should eventually be. decreed to be the true landlord. In suits about a specific thing which is sequestered, our courts always allow the defendant to bond, if he thinks proper, and on failure to do so, the plaintiff. There being a controversy about this cotton press. the tenants in possession did precisely what would have been ordered by a court if the property had been sequestered. And we cannot believe but that the courts in Alabama, if *James Erwin* and his securities were now before them, would compel them to pay over the money he received from the tenants, and which, it has since been ascertained by a decree in chancery, belonged to the plaintiffs, and not to him.

We think that the bond might very properly, under the circumstances, have been delivered to the receiver, and by him to the plaintiffs under this clause in the chancellor's decree, "that the receiver should deliver over to the complainants all documents and evidences of rent not yet collected or secured, and all contracts in relation to the premises which may be in his possession or power to produce." And, since *Hurtil* and *Mansoni* were willing to transfer the bond, that the decree was, in effect, a transfer and assignment of it to the plaintiffs to the extent of the rent received by *James Erwin* in cash.

As the tenants had given notes in part payment of their rent, they could and very properly did reserve an interest in the bond, to defend themselves against recourse on those notes, as they had compromised and settled all the balance of the rent. If unsuccessful in their defence, they reserved a right to recover on the bond what they might be compelled to pay on the notes, and assigned only the right to recover the cash paid by them to *Erwin.* We see no reason why this qualified assignment may not be made, especially as we have considered it in some degree in execution of the chancellor's decree.

We do not see the least foundation for the argument, that our courts ought not to take cognizance of the cause, as it belongs to the courts in Alabama, they having taken cognizance of it. *James Erwin* and his securities, the defendants in this cause, were not before the courts in Alabama. The decree of the chancellor in Alabama, ordered all the property in controversy, and all contracts and papers in relation to it, to be given to the complainants; evidently terminating all controversies and incidents in that suit, and enabling the complainants to assert their further rights, in the same or other courts in that or other States, as justice and equity might require.

It is therefore ordered, adjudged and decreed, that the judgment of the district court be reversed; and that the plaintiffs recover from the defendants *in solido* the sum of $14,800 with eight per cent interest from the 22d of March, 1848, the date of the judicial demand, and costs in both courts.

EUSTIS, C. J. concurring. I concur in the conclusions of the opinion just delivered, but my reasons are not the same as those assigned by Mr. Justice Preston. I find no difficulty in assenting to the opinion in all the material points, except that on which the case was decided in the court below.

It was decided on a plea of the defendants, that the bond was given for a consideration unlawful and against the settled policy and laws of Alabama; and for that reason the said bond was not valid, and no action could be maintained upon it by the laws of Alabama. *Hurtil* and *Mansoni* were the tenants of certain assignees of the late Bank of the United States; they afterwards attorned to *James Erwin* and paid him rent, and this bond was given to indemnify them against any loss in consequence of this attornment.

I have not been able to discover that, by the common law or by the jurisprudence of the State of Alabama, an attornment, made under the circumstances attending this, is illegal and against public policy. There is no plea charging any collusion or fraud between *Erwin* and *Hurtil* and *Mansoni*, in the attornment; nor is there sufficient proof of any such fraud or collusion. And for these reasons, I consider the objection to the validity of the bond as not supported.

I prefer to rest my decision on this view of the subject, as the matter rests exclusively on the jurisprudence of another State not similar to that of our own; and I do not feel myself called upon to assent to the views of the law and

DUNDAS      fact stated in the opinion of Judge Preston: it being sufficient to state my con-
   *v.*      currence in his conclusions.
ERWIN.

~~~~~~~~~~~

## SAME CASE.—ON A RE-HEARING.

THE judgment of the court, on an application for a re-hearing, was pronounced by

PRESTON, J. A re-hearing having been prayed for by the defendants and appellees in this case, and the counsel for the plaintiffs consenting thereto; it is therefore ordered, adjudged and decreed that the judgment entered by this court in this cause on the 23d of December, 1850, be so amended as to read as follows : And that said plaintiffs, *James Dundas, Mordecai D. Lewis, Samuel W. Jones,* and *Robert L. Pitfield,* and *Robert Howell,* assignees and trustees of the Bank of the United States, recover of and from the defendants, *James Erwin, Yeatman, Woods & Co.,* and the partners of said firm, *James Woods, Robert Woods,* and *Andrew Erwin,* trustee for *John* and *Jane Bell, in solido,* the sum of fourteen thousand dollars, with eight per cent per annum interest thereon from 22d day of March, 1848, and costs in both courts. And it is further ordered and decreed that the re-hearing prayed for in this case be refused.